**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

PATRICIA A. DOGMANITS          :
       Plaintiff,              :
                         :
           v.               :     CIVIL ACTION
                         :     No. 04-CV-290
CAPITAL BLUE CROSS             :
       Defendant.              :

### MEMORANDUM AND ORDER

**JOYNER, J.**                                          **July 7, 2005**

    Via the motion now pending before this Court, Defendant Capital Blue Cross moves for summary judgment on both Counts of the plaintiff's Complaint. For the reasons outlined below, the motion shall be GRANTED.

### Factual Background

    Plaintiff Patricia Dogmanits brings suit against Defendant Capital Blue Cross (CBC) for violation of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., (Count I) and violation of the prescriptive and proscriptive provisions of the Family and Medical Leave Act, 29 U.S.C. §2611, et seq. (Count II).

    Plaintiff was employed by Defendant from November 1978 until her termination on November 29, 2001. (Second Amend. Compl. ¶¶ 3, 18). Throughout the course of her employment, Plaintiff held various positions, the latest of which was Supervisor of Sales Control. (Dogmanits, depo. 21).  In 1999, as the result of

a company relocation, Plaintiff's round trip work commute grew to approximately 200 miles. (Dogmanits, depo. 32).

On May 31, 2001, Plaintiff became ill, was admitted to the hospital for an emergency appendectomy and was diagnosed with colon cancer. (Second Amend. Compl. ¶¶ 5-7).  Plaintiff subsequently underwent chemotherapy treatment from July 2001 through November 2001.  (Dogmanits, depo. 47).  The chemotherapy caused side effects such as vomiting, diarrhea, tiredness, lack of concentration, forgetfulness, numbness in extremities, and sensitivity to temperature.  (Dogmanits, depo. 46).  Because of her forgetfulness and lack of concentration, Plaintiff had some difficulty driving.  (Dogmanits, depo. 46-47).

As a result of her illness, Plaintiff applied and was approved for FMLA leave beginning May 31, 2001. (Second Amend. Compl. ¶ 10). Plaintiff acknowledges that she was able to use all of her available FMLA leave, which she exhausted in July 19, 2001. (Dogmanits, Depo. 55; Second Amend. Compl. ¶10). In a letter sent shortly thereafter, Defendant notified Plaintiff that her former job would no longer be held open. (Second Amend. Compl. ¶11).

Generally, Defendant's policies indicate that employees are allowed up to 26 weeks of medical leave, 12 of which are provided under the FMLA. (Exhibit 8, p.3). During FMLA leave, employees are guaranteed to return to their pre-leave position. (Exhibit 8,

p.3).  After exhausting FMLA leave, employees may be eligible for additional non-FMLA leave; however, they are no longer guaranteed to return to their pre-leave positions. (Exhibit 8, p. 3). The total amount of combined leave provided by Defendant's policies is six months. (Exhibit 8, p.3). Employees who cannot return after six months are terminated. (Exhibit 10, p.7)

While on leave, employees can receive pay benefits from short term disability (STD) or long term disability (LTD). To be eligible for STD benefits, employees must first use four days worth of time from their paid-time-off (PTO) accounts and then exhaust any accrued disability hours. (Exhibit 8, p.6; Exhibit 11, p.1) Employees who do not qualify for STD may still be eligible for LTD benefits, which begin on the first day of the sixth month following the injury. (Exhibit 10, p.2). As of May 31, 2001, Plaintiff had accumulated 269.66 hours of PTO and 927.25 hours of disability. (Second Amend. Compl. ¶¶ 16, 17).

Around October 2, 2001 Plaintiff received a letter from Kieran R. Hull, Manager of Employee Benefits. (Dogmanits, depo. 59-60). The letter stated that by November 26, 2001 Plaintiff would have only 18.75 hours of her 26 weeks of leave remaining and that her case had been submitted for consideration by Defendant's LTD carrier. (Exhibit 13, p.1). Pursuant to the letter and a conversation that took place on November 2, 2001, Plaintiff applied for LTD on November 4, 2001 (Exhibit 16;

3

Dogmanits, depo. 68, 73). Plaintiff was approved for LTD benefits for the period running from November 1, 2001 to Jan 31, 2002. (Dogmanits, depo. 72-73).

In telephone conversations during October and November 2001, Hull and Garland attempted to help Plaintiff avoid termination by discussing options which would allow her to end full-time leave by returning to work in a part-time capacity. (Dogmanits, depo. 69-70; Garland, depo. 33-34). Plaintiff had been offered a position consisting of a few hours of reading per day, which could be performed at home. (Garland, depo. 33-35). Plaintiff informed Hull and Garland that she was unsure if her doctor would permit her to return to work in any capacity. (Dogmanits, depo. 69-70; Garland, depo. 33-34).

On November 27, 2001, Hull sent Plaintiff another letter, which referred to three previous conversations in which Plaintiff was told that she would have to return to work in some capacity by November 29, 2001 in order to avoid termination. (Exhibit 14; Dogmanits, depo. 69-71). Hull reiterated that the part-time, work-at-home arrangement they had previously contemplated was still open to Plaintiff, if she was medically cleared to return to work. (Exhibit 14; Dogmanits, depo. 69-71). The letter also indicated that, in the event of termination, Defendant would make the same part-time job available for Plaintiff should she choose

to re-apply after receiving a medical release to work. (Exhibit 14, p.3).

As of November 29, 2001, Plaintiff's doctor did not clear her to return to work in any capacity, including the part-time, work at home arrangements offered by Defendant. (Dogmantis, depo. 71; Garland, depo. 35). On November 29, 2001, Plaintiff exhausted her 26 weeks of available leave and was terminated from CBC. (Second Amend. Compl. ¶18). November 29, 2001 was also the date of Plaintiff's final chemotherapy treatment. (Dogmanits, depo. 64-65). At the conclusion of her chemotherapy treatments, Plaintiff felt a few lingering side effects which eventually receded. (Dogmanits, depo. 82). At the time of her termination, Plaintiff's doctor had not yet provided a definite return to work date. (Dogmantis, depo. 71).

After her termination, Plaintiff's LTD benefits continued until she received a medical release to return to work around January 23, 2002. (Second Amended Complaint ¶24; Dogmanits, depo. 56). Plaintiff's medical clearance to work was not subject to any ongoing restrictions due to her illness or any side effects of her chemotherapy. (Dogmanits, depo. 82). Since January 2002, Plaintiff has not suffered any relapse of her cancer, nor has she been impaired in working or other life activities because of her prior illness. (Dogmanits, depo. 82-83).

In December 2001 and January 2002, Plaintiff and her supervisor, Deb Garland, began discussing Plaintiff's reemployment possibilities at CBC. (Dogmanits, depo. 101).  To help facilitate Plaintiff's return to CBC, Ms. Garland obtained management approval to create a new, unbudgeted Technical Analyst position for Plaintiff.  (Dogmanits, depo. 90-91; Garland, depo. 37-39; Hull, depo. 73).  Plaintiff asserts that during her conversations with Garland, she was led to believe that she would be able to work from home several days each week and that her salary would be around $40,000. (Dogmanits, depo. 94, 101). Thus, Plaintiff applied for reemployment with CBC. (Second Amended Complaint ¶25).

After Plaintiff completed her application for reemployment, Employee Relations Specialist Meri Richardson sent Plaintiff a letter dated February 7, 2002 notifying Plaintiff that she was accepted for a position as a Technical Analyst. (Exhibit 22). Although the letter indicated a starting salary of $36,400, it did not mention whether Plaintiff would be able to work from home. (Exhibit 22).

Plaintiff asserts that she denied Defendant's offer because it did not mention accommodations for working at home, it did not provide future STD benefits for her condition, and it was $4,000 lower than her previous offer and around $14,000 lower than her pre-leave position. (Dogmanits, depo. 93, 94, 111-112). Defendant

6

contends that Richardson's letter was merely congratulatory, and that further arrangements for working at home had yet to be determined. (Richardson, depo. 18-19). Further, Defendant argues that the Plaintiff knew that the $40,000 salary she discussed was subject to approval. (Def. Br., p. 5).

### Legal Standard for Summary Judgment

The purpose of summary judgment under Federal Rule of Civil Procedure 56(c) is to avoid unnecessary trials that would only cause delay and expense. Goodman v. Mead Johnson & Co., 534 F.2d 566, 574 (3rd Cir. 1976). A court may properly grant a motion for summary judgment only where the evidence before it presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-32 (1986). A genuine issue of material fact exists where "a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the party opposing the motion may not rest upon the bare allegations of the pleadings, but must set forth "specific facts" showing that there

is a genuine issue for trial.  Fed. R. Civ. P. 56(e); <u>Celotex</u>,
477 U.S. at 324.


## Discussion

### Count I: Violation of the Americans With Disabilities Act

Plaintiff Patricia Dogmanits claims that she was unlawfully
terminated by Defendant CBC as a result of her disability
resulting from colon cancer.  (Pl.'s Second Amend. Compl. ¶44).[1]
The Americans with Disabilities Act [ADA] prohibits employers
from discriminating against any qualified individual with a
disability on the basis of their disability.  42 U.S.C. §
12112(a) (1995).  In order to make out a prima facie case of
discrimination under the ADA, Plaintiff must prove that she: (1)
is "disabled," (2) is a "qualified individual," (3) has suffered
an adverse employment action because of that disability.  <u>Buskirk
v. Apollo Metals</u>, 307 F.3d 160, 166 (3d Cir. 2001).

Viewed as a stand-alone act, termination qualifies as
an "adverse employment action" even under the most stringent of

---

[1] Plaintiff's memorandum of law in opposition to Defendant's motion for
summary judgment contains claims that do not appear in the Second Amended
Complaint.  Because these claims were not properly pleaded in Plaintiff's
latest version of the complaint, these issues are not before this Court.
Specifically, these late-arriving claims are:
    (1) Defendant discriminated against her based on her disability while
attempting to rehire her for permanent employment once she was medically
cleared to return to full-time work.  Pl.'s Memo. Opposition Def.'s Mot. S.J.
20 (May 13, 2005);
    (2) That "one of the Defendant's motivating reasons for the
investigation of a very small group of older employees may have been to rid
itself of older workers."  <u>Id.</u> at 11.  This vestige of an age discrimination
claim is clearly not part of the present action.

definitions.  The viability of Count I of Plaintiff's claim, however, depends on establishing the first and second elements of a discrimination case.

### 1. Plaintiff as "Disabled" Under the ADA

The ADA defines "disability" as:

> "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such impairment; or
>
> (C) being regarded as having such an impairment."

42 U.S.C. § 12102(2).

To qualify as "disabled" under the ADA, a claimant must establish that he or she has a physical or mental impairment that substantially limits major life activities.  Toyota Motor Mfg., Inc. v. Williams, 534 U.S. 184, 195 (2002).  EEOC regulations created for interpreting the ADA define "substantially limit" as "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  Id. at 195-196 (quoting 29 C.F.R. § 1630.2(j)).  The nature and severity of the impairment, the duration or expected duration of the impairment,

and the actual or expected permanent or long-term impact of the impairment should also be considered.  Id. at 196 (quoting 29 C.F.R. § 1630.2(j)(2)(i)-(iii)).

There is little question that the life-threatening, debilitating effects of cancer and its subsequent treatment can qualify as an "impairment" under the ADA.  However, the determination of whether an individual is "disabled" is not based solely on a name or the stereotypical nature and character of an impairment, but rather on the "effect of that impairment on the life of the individual."  Id. at 198.  Congress intended that each determination be made on a case-by-case basis.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999).  In Toyota, the Supreme Court narrowly construed the definition of "disability" by establishing that the impact of an impairment must be "permanent or long-term."  Id. at 198.  The Third Circuit also held that temporary, non-chronic impairments of a short duration with little to no long-term impact do not qualify as disabilities under the ADA.  Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 765 (3d Cir. 2004).

After being diagnosed with colon cancer, Plaintiff underwent chemotherapy, which was accompanied by side effects such as vomiting, diarrhea, tiredness, an inability to concentrate, forgetfulness, and sensitivity to temperature.  Plaintiff's doctor found that these symptoms made her medically unfit for

10

employment in any capacity from May 2001 until January 2002. Upon receiving medical clearance to return to work, Plaintiff continued to feel minor side effects from the final round of chemotherapy.  There were no additional diagnoses of cancer, however, and Plaintiff was not subject to any physical or medical restrictions at work.

The question of whether an impairment similar to the instant case caused by cancer is sufficiently "permanent or long-term" to qualify as a "disability" under the ADA has yet to be answered by this Court or the Third Circuit Court of Appeals.  Because this Court concludes that Plaintiff fails to make out a prima facie case under the ADA on other grounds, the difficult issue of cancer's designation as a "disability" will be reserved for another day.

### 2.  *Plaintiff Was Not "Regarded As" Disabled by Defendant*

Although it is, at best, unclear from the Second Amended Complaint whether Plaintiff actually claims she was "regarded as" disabled by Defendant, this Court will err on the side of caution and address the issue on its merits.

Pursuant to the ADA, a person is "regarded as" disabled if he or she:

"(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by

11

the [employer] as constituting such limitation;

(2) Has [such impairment] only as a result of the attitudes

of others toward such impairment; or

(3) Has [no such impairment] but is treated by an [employer]

as having a substantially limiting impairment."

Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 381 (3d Cir. 2002)
(quoting 29 C.F.R. § 1630.2(1)). An employee is "regarded as"
disabled if an employer misinterprets information about an
employee's limitations and precludes the employee from performing
a wide range of jobs. Id. An employer is also liable for
discrimination if it wrongfully regarded an employee as so
disabled he or she was unable to perform any kind of work and, as
a result, denied him or her a job. Williams, 751 F.3d at 769.

There is simply no evidence in the instant case to support
Plaintiff's claim that Defendant terminated her employment at CBC
as a result of mistakenly identifying her as "disabled." On the
contrary, prior to exceeding the company's maximum allowable
leave time, the record indicates that Plaintiff and her doctor
maintained sole control over her ability and timing for resuming
employment at CBC. Plaintiff voluntarily sought a medical leave
of absence, available to all CBC employees under the company's
benefits policy, to recover from a bout with colon cancer. Just
prior to her termination, Plaintiff informed Defendant that her
doctor deemed her medically unfit for work in *any* capacity, even

12

a part-time, work-at-home role offered by Defendant.  Plaintiff also told Defendant that her doctor could not supply any timetable for her return to either full-time or part-time employment duties at CBC.

Defendant adhered to established company policy and procedure by granting Plaintiff leave time, disability benefits, and, when she exhausted the maximum allowable leave time, terminating her employment.  Plaintiff received the same treatment and benefits available to all CBC employees, whether they were on a leave of absence due to cancer, a back injury, or mental illness.  Plaintiff fails to prove that her termination resulted from Defendant's wrongful perception of her disability.  The record reflects, rather, that Plaintiff informed Defendant that she was unable to return to work in any capacity because of her medical condition, and was terminated only after she exhausted the maximum amount of leave time available to her, and any other CBC employee, under CBC's uniformly-applied benefits and leave policy.

Even if viewed in a light most favorable to Plaintiff, the evidence before this Court could not persuade any reasonable jury to conclude that Plaintiff was "regarded as" disabled within the definition of the ADA.  This Court finds that Plaintiff's "regarded as" disabled claim fails as a matter of law.

### 3. *Plaintiff Was Not a "Qualified Individual" Under the ADA*

Even assuming Plaintiff did qualify as "disabled," either by the substantially limiting nature of her impairment or being "regarded as" disabled by Defendant, Plaintiff's claim would still fail because she does not establish that she is a "qualified individual" within the meaning of the ADA.  At the time Plaintiff's employment was terminated, the evidence demonstrates that she was unable to perform the essential tasks of her job, even with the assistance of reasonable accommodations.  Thus, Plaintiff does not make out a prime facie case for discrimination under the ADA, and Defendant's Motion for Summary Judgment must be granted.

The ADA defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

Determining whether someone is a qualified individual is a two-part inquiry.  First, a plaintiff must demonstrate that he or she possesses the skill, experience, or education necessary to adequately perform the job.  Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001).  Next, a plaintiff must establish that he or she can perform the essential functions of the position, with or without reasonable accommodation.  Id.  "This determination is to be made at the time of the employment

decision." <u>White v. Stroh Brewery Co.</u>, 15 F. Supp. 2d 734, 737 (E.D. Pa. 1998) (citing <u>Gaul v. Lucent Technologies, Inc.</u>, 134 F.3d 576, 580 (3d Cir. 1998), where the court followed EEOC regulations for implementing the ADA, 29 C.F.R. § 1630 App. at 353-354).

Upon learning of an employee's disability, an employer has a duty to engage in a good faith interactive process with the employee to seek reasonable accommodations. <u>Williams</u>, 380 F.3d at 761. Reasonable accommodations can include job restructuring, or part-time or modified work schedules. 42 U.S.C. § 12111(9)(B). In some circumstances, a leaves of absence for medical treatment can also be considered as a reasonable accommodation. <u>Shannon v. City of Phila.</u>, 1999 U.S. Dist. LEXIS 18089 at *20-23 (E.D. Pa. Nov. 23, 1999) (citing cases from the First, Sixth, and Tenth Circuits as well as EEOC guidelines for interpreting the ADA, 29 C.F.R. § 1630.2(o) App.).

However, leave time must enable the employee to perform his or her essential job functions ***in the near future***. <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 151 (3d Cir. 2004). The weight of authority in the Third Circuit, as well as other Circuits, clearly establishes that a leave of absence for an indefinite duration is not a reasonable accommodation. <u>See</u> <u>e.g.</u>, <u>Fogleman v. Greater Hazelton Health Alliance</u>, 122 Fed. Appx. 581, 2004 WL 2965392 at *3 (3d Cir. 2004) (holding that an indefinite

or open-ended leave "does not constitute a reasonable accommodation"); Peter v. Lincoln Technical Inst., 255 F. Supp. 2d 417, 437 (E.D. Pa. 2002) (citing to Fourth, Fifth, Sixth, and Tenth Circuits in concluding that "an indefinite leave is inherently unreasonable").

The evidence put forth by Plaintiff is insufficient to establish that she was a "qualified individual" under the ADA. Plaintiff's 23-year record of employment with CBC demonstrates that, prior to her illness, she possessed both the skills and experience required to perform her job.  The evidence also demonstrates, however, that at the time of her termination, Plaintiff was unable to perform the essential tasks of her position despite the assistance of reasonable accommodations.

The record in this matter indicates that Defendant engaged in an interactive process with Plaintiff prior to her termination.  Through multiple letters and telephone conversations, Kieran Hull, Director of Human Resources, and Deb Garland, Plaintiff's supervisor, communicated with Plaintiff regarding the company's medical leave policy and Plaintiff's benefits status and employment options.  Plaintiff was notified that if she did not return to work in some capacity before exhausting the maximum 26 weeks of leave time allowed under CBC's policy, she would be terminated.

In an effort to allow Plaintiff to avoid termination, Hull and Garland suggested part-time, work-at-home arrangements where Plaintiff could perform a few hours of reading per day.  This would have allowed Plaintiff to end her full-time leave of absence before she exhausted the maximum allowable leave time.  Plaintiff declined these accommodations because her doctor would not permit her to return to work in *any* capacity.  At the time of termination, Plaintiff could not offer any definite return date, so her request for accommodation amounted to a request for an indefinite leave of absence.

Plaintiff argues that a leave of absence is a reasonable accommodation under the ADA and that Defendant was obligated to extend additional leave beyond the maximum 26 weeks mandated by company policy.  The courts in the cases cited by Plaintiff, however, have examined requested leaves of a finite timeframe in the context of employers' policies and found that leaves of an indefinite duration are unreasonable.  See e.g., Shannon, 1999 U.S. Dist. LEXIS 18089 at *19, 20-21 (examining plaintiff's leave request in context of City's leave policy and stating that an indefinite leave of an unknown duration is not reasonable); Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir. 1998) (stating that leave provided to a disabled employee should not exceed the leave available to a non-disabled employee); Rascon v. U.S. West Commun., Inc., 143 F.3d 1324, 1334 (10th Cir. 1998) (finding

17

that, where an employee fails to provide an expected duration of the leave, indefinite leave is not a reasonable accommodation).

By terminating Plaintiff's employment only after she had extinguished 26 full weeks of paid medical leave, Defendant was merely complying with company policy.  Plaintiff failed to show that Defendant applied this policy unequally, selectively, or in a discriminatory manner.  Requiring Defendant to grant Plaintiff an indefinite leave of absence, in excess of a consistently applied company policy, would be an unreasonable accommodation and unfair to CBC's other employees.

Because of her inability to do work of any kind, even with the assistance of reasonable work-at-home accommodations, Plaintiff was unable to perform any essential function of her job.  Further, Plaintiff was not able to provide a definite date when she would be able to resume either a full-time or part-time work schedule.  We find that Defendant's offers to provide reasonable accommodations that would conform to company policy and permit Plaintiff to retain employment fulfilled the company's duty to engage in a good faith, interactive process.  We conclude that no reasonable jury could determine from the evidence before this Court that, at the time of termination, Plaintiff met the standard of a "qualified individual" under the ADA.  Therefore, we find that Plaintiff fails to make out a prima facie case for

discrimination under the ADA, and that Defendant's Motion for Summary Judgment on Count I must be granted.

### Count II: Prescriptive and Proscriptive Violations of FMLA

The FMLA provides eligible employees with up to 12 work weeks of medical or family leave during any 12-month period. 29 U.S.C. § 2612(a)(1). To be eligible for leave under the FMLA, an employee must have been employed "(i) for at least 12 months by the employer [from] whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).

In this action, Plaintiff claims that Defendant violated the prescriptive and proscriptive provisions of the FMLA. Prescriptive or substantive FMLA rights include an eligible employee's ability to obtain leave provided by the FMLA. Campetti v. Career Education Corp., No. 02-CV-1349, 2003 U.S. Dist. LEXIS 12202, at *34 (E.D. Pa. June 25, 2003). Proscriptive FMLA rights include "protection in the event that an employee is discriminated against for exercising the prescriptive rights as set forth in the statute." Id. at *35.

#### *Prescriptive Violations of the FMLA*

Plaintiff first claims that Defendant terminated her to prevent her from exercising her rights under the FMLA. (Second

19

Amend. Compl. ¶50). Based on the evidence presented, however, no
reasonable jury could determine that the Plaintiff's FMLA rights
were violated.  First, Plaintiff acknowledges that she was able
to use all of her available FMLA leave until it expired on July
19th, 2001. Even after she exhausted her FMLA leave, Plaintiff
was able to take additional non-FMLA leave from July 19, 2001 to
November 28, 2001. Next, Plaintiff fails to indicate
approximately when she would have requalified for FMLA leave had
she not been terminated. Finally, Plaintiff was informed after
her termination that if she were re-hired she would be able to
re-gain FMLA eligibility upon fulfilling the statutory
requirements. Because Plaintiff presents no evidence indicating
that Defendant terminated her to prevent her from exercising FMLA
rights, no reasonable jury could find that Defendant violated
Plaintiff's prescriptive rights under the FMLA.

Plaintiff also argues that Defendant willfully and
intentionally violated the FMLA by not restoring her to her pre-
leave position. (Second Amend. Comp. ¶51). The FMLA requires that
employees returning from up to 12 weeks of FMLA leave "be
restored by the employer to the position of employment held by
the employee when the leave commenced or to an equivalent
position with equivalent employment benefits, pay, and other
terms and conditions of employment." 29 U.S.C. §2614(a)(1).
However, employees who exhaust the twelve weeks of leave provided

20

under the FMLA stand to lose their entitlement to job restoration even if their employers provide additional, non-FMLA, leave. Frederick v. Brandywine Hosp., Inc., No. 03-3362, U.S. Dist. LEXIS 12151, at *3 (E.D. Pa. July 1, 2003) (noting that "[p]rotection under the FMLA is strictly limited to the 12 week period"); Panto v. Palmer Dialysts Ctr., No. 01-6013, U.S. Dist. LEXIS 5663, at *20 (E.D. Pa. April 7, 2003) (holding that employer policies that surpass the requirements of the FMLA are not protected under the FMLA); 29 C.F.R. §825(b) (stating that employees who are unable to work because of the continuation of a serious health condition have no right to job restoration under the FMLA).

Here, 29 U.S.C. 2614(a)(1) does not apply because Plaintiff's leave exceeded that which would have been protected under the FMLA.  Although Plaintiff was able to take additional, non-FMLA, leave after exhausting her FMLA leave, Plaintiff's entitlement to restoration was only guaranteed for the statutory 12 week period. Because 29 U.S.C. 2614(a)(1) does not apply to non-FMLA leave, no reasonable jury could find that Plaintiff was entitled to restoration of pre-leave employment.

### *Proscriptive Violations of the FMLA*

Next, Plaintiff claims that her proscriptive FMLA rights were violated because Defendant terminated her in retaliation for having exercised her right to FMLA leave. (Second Amended

Complaint, ¶50). To support a claim of retaliation, Plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to that leave. <u>Conoshenti v. Public Service Electric & Gas Co.,</u> 364 F.3d 135, 146 (3d Cir. 2004).

Plaintiff fails to establish a prima facie case of retaliation because she has not shown that she suffered an adverse employment action. In order to show that termination was adverse, Plaintiff needs to present evidence indicating that she could have performed her job duties at the time of her termination. <u>Alifano v. Merck Co.,</u> 175 F.Supp.2d 792,795 (E.D. Pa 2001). However, it is undisputed that Plaintiff was not able to return to work at the time of her termination because of her illness. In fact, Plaintiff could not obtain a work release from her doctor until over a month after her termination. Because Plaintiff was unable to perform her job at the time of her termination, she has not shown that she suffered an adverse employment action.

Even if Plaintiff could identify an adverse employment action, Plaintiff's retaliation claim would still fail because there is no casual connection between her FMLA leave and her termination.  To determine whether the casual connection requirement has been fulfilled, the Third Circuit has focused on timing and evidence of ongoing antagonism. <u>Abramson v. Wm.</u>

<u>Paterson College of N.J.</u>, 260 F.3d 265, 288 (3d Cir. 2001)(citing <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 281 (3rd. Cir. 2000); <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920-921 (3rd. Cir. 1997)). While Plaintiff presents no evidence of ongoing antagonism, she does argue that the temporal proximity of her FMLA termination to her leave is sufficient to establish causation.

It is undisputed that at least four months passed between Plaintiff's exhaustion of FMLA leave on July 19th and her termination on November 29th.  This Court has recently held that a four month gap between FMLA protected activity and termination will not, in itself, establish causation. <u>Walker v. Independence Blue Cross</u>, No. 03-6396, U.S. Dist.  LEXIS 10219, at *29 (E.D. Pa. May 27, 2005). In addition, the Third Circuit requires that the timing of an alleged retaliatory action be "unusually suggestive" in order for a casual link to be inferred. <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 503 (3rd. Cir. 1997).  It follows that a casual link cannot be inferred from Plaintiff's exhaustion of FMLA leave to her termination over four months later.  Because Plaintiff fails to establish a prima facie case of retaliation, no reasonable jury could find that Defendant violated her proscriptive rights under the FMLA.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
PATRICIA A. DOGMANITS       :
         Plaintiff,         :
                            :
              v.            :    CIVIL ACTION
                            :    No. 04-CV-290
CAPITAL BLUE CROSS          :
         Defendant.         :
```

## <u>ORDER</u>

AND NOW, this 7th day of July, 2005, upon consideration of Defendant Capital Blue Cross' Motion for Summary Judgment on Plaintiff's Second Amended Complaint (Document No. 14), Plaintiffs' response thereto (Document No. 18), and Defendant's reply (Document No. 19), it is hereby ORDERED that the Motion is GRANTED, and judgment as a matter of law is ENTERED in favor of Defendant and against Plaintiff in no amount.

BY THE COURT,

s/J. Curtis Joyner
J. CURTIS JOYNER, J.